The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Welcome everyone. We will take up the cases in the order in which they appear on the docket. I first, however, want to thank Chief District Judge Lee Rosenthal from the Southern District of Texas for joining us today. We really appreciate your help on this and past occasions and hopefully future occasions too. The first, let's see, 1, 2, 3, 4, 5 cases have been submitted on the briefs and we will take up McCurley v. De Forest. And counsel, when you're arguing, you may take off your mask to argue if you wish. It's up to you. It's your choice. So we will proceed. Good morning, Your Honors. Adrian Bacon on behalf of appellants. And may it please the court, I'd like to reserve five minutes for rebuttal. Be mindful of the clock. Will do. Thank you, Your Honor. This appeal is about accountability in an age where consumer privacy threats are reaching a boiling point. Royal Seas seeks to evade liability and apply a heightened legal test to agency under the TCPA, which is no liability without fault. This position is based purely on an exculpatory clause in its contract with its agent. The relevant provisions of the marketing agreement are undoubtedly exculpatory in nature as they delegate an absolute affirmative duty held by telemarketers to not only robocall with a prerecorded voice, to only robocall with a prerecorded voice if they have a consumer's prior express written consent. The delegation in this case was made to an extra jurisdictional entity by a subsidiary of a large American corporation that itself has a history of violating the TCPA in the same manner that gave rise to this case, which is subject to a consent judgment to do better by the FTC. Why does that make any difference? Well, it makes a lot of difference, and I can get into that now. Well, but it seems to me the issues are straightforward. I'm not sure that they're easily answered, but we're dealing here with a question of whether or not there's agency. And there are three theories of agency that you offer. We all know they're not employees, so we don't have respondeat superior. And it's actual agency, apparent authority, or ratification. And so it seems to me your time would be better spent, from my perspective at least, addressing those three theories and telling us why you think the district court got them wrong. Certainly, Your Honor. And I'll get to the ratification issue in due course. It really only implicates ratification, the last thing that you asked me about. I'll start with direct agency because I think that's the most interesting issue that we have here. I think it's important to look at the landscape of circuit-level jurisprudence, especially in the Ninth Circuit, in deciding direct agency. We've got two cases that Royal Seas relies on. We have the Christensen case and the Jones case, and neither are even remotely analogous to what happened here. In the Jones case, this court only analyzed direct agency. And in Jones, there was explicit language in the contract between the agent and the seller that prohibited telemarketing by means of robocalls. Here, there's expressed language in the contract calling for a prerecorded voice. Well, but it asks – there is expressed language in the contract which says, in order to do so, you must comply with all laws, which would be getting consent before making those kinds of calls. So on express agency, since you started with it, what is the evidence of express agency? Are you relying solely on the contract, or is there something more that, in your view, establishes express agency? Well, there's a lot. I think the most important evidence is always going to stem from the contract because the contract is going to set forth the authorization that the seller has over the telemarketer to oversee their – But don't we have a Ninth Circuit case that explicitly forecloses your position that the provision in the contract that says you must obtain, you know, express written consent means that that's what was contemplated? I mean, I don't know how we get around that case. Which case are you referencing, Your Honor? Honestly, I think it's Jones, but I'm not quite sure. So I can talk extensively about why Jones doesn't apply here. So in the Jones case, there's expressed language in the contract that says that they are not going to be calling with a prerecorded voice. And in this case, there's expressed language in the contract that says that they will use a prerecorded voice, and in fact that Royal Seas Cruises is going to help oversee – Sure. They were authorized to use a prerecorded voice. Nobody doubts that. But they were also told you may not use a prerecorded voice – this language, I think, fairly says that – unless you obtain consents. So they didn't do that. We all know they didn't do it. My question is where can I find an express delegation of agency to the telemarketer to make non-consenting calls? I just – I don't see it in the contract. You can distinguish the contract from Jones, but the contract doesn't give them the authority to make non-consenting calls. And I don't see any other evidence in the record that they were given authority to make non-consenting calls. Now, this doesn't go to your other two theories, but at least on express authority, what evidence is there? Point me to a piece of evidence that says they were given express authority to make non-consenting calls. So this bleeds into the ratification issue, and if I may, I'll direct the court to a decision that came out after our reply brief. It's a district court decision. It's called Brown v. Direct TV. It's case number CB13-1170. It's in front of Dolly M. Gee in the Central District of California, and it was issued on December 1, 2021. It's a summary judgment decision. It looked at these exact same issues in an almost identical fact pattern of a case. In that case, you had a contract just like Royalty's contract that said that they were going to follow all the laws, and it said that they were going to be robocalling people, in this case, to collect debts for Direct TV. And there was also express authorization to terminate at any time. And what the district court found in that case was that the power to terminate at any time was in and of itself dispositive of an agency relationship. And then it went on to the ratification analysis, which I think directly addresses the question that you just asked. And I'll read from an interesting portion of that decision. You know, it would be helpful if, as our rules require, when you discover cases, you file a Rule 28J letter so they would be in front of the court and the other parties at the hour of argument. But go ahead. Understood, Your Honor. So the case said that the uncontroverted evidence showed that Direct TV, at the very least, should have investigated further. And the reason was that it knew that its calling agents were doing something called skip tracing. And skip tracing is, in that context, where you basically look up somebody's phone number through public record searches because you don't necessarily know it. And what they estimated, based on their knowledge of the data, Direct TV being, was that 10% of the phone numbers in the accounts for the third-party collections efforts... But this is a ratification theory, is it not? It is, but it's also related to... And I understand it as a ratification argument, and maybe you want to move to ratification. But it seems to me it doesn't establish direct express authority. It simply establishes that they acted maybe, in your view, in willful ignorance. Let me clarify this. Are you saying because of the nature of the abuse of the robocalls by the cruise industry, these provisions in this contract were just a wink and a nod to the law, and everybody knew what was really going on? If that's what you're arguing, you don't have any evidence of that. We can say, oh, we've created a genuine issue of material fact on the summary judgment. We do actually have evidence of that, which is what I'm getting to right now, Your Honor. In the Direct TV case, they had data which indicated to them that 10% of the skipped trace numbers were being called without consent. In this case, at excerpt of record 886-889, we've cited to evidence that show that only 87% of the people who were called by prospects for Royal Seas had a phone number that matched in the consent data. Only 69% matched the phone number and the last name, which is a much lower compliance rate than the 10% that the district courts found was sufficient for ratification. I want to be clear. I've been trying, as you're talking, to find this decision. Apparently, I can't find it in Westlaw. But did the district judge in that case find that there was ratification or express authority? Both. She said there was express authority because there was a contract that authorized them to place robocalls to people without consent. No, it didn't say that. Of course, it didn't say that. It's never going to say that. But what it did is it authorized certain conduct. And this gets into our non-delegable duty argument. The conduct is what- Is this at a level of hazard that non-delegable duty is usually associated with? This may be significant inconvenience, particularly if it comes during the dinner hour. But where is the nature of the activity that would warrant non-delegable duty doctrine? The Federal Communications Commission's order under the Hobbs Act is binding on this court. And it held that it is a non-delegable duty. That's our position. And we've quoted sections of it which seem to suggest that that's exactly what the FCC was saying. How does that square with the general rule that this is not a vicarious liability statute? If it's a non-delegable duty, then any time you showed a violation by an independent contractor, there would be liability, right? You wouldn't need anything. You wouldn't need anything. Well, that's what non-delegable duty means. If an independent contractor breaches a non-delegable duty, then the principal is held responsible. So isn't that an argument that the principal is always responsible? The principal is responsible if the conduct happens within the scope of what is authorized. Right. So if you hire an independent contractor, your view is, and you hire an independent contractor to make telemarketing calls, that independent contractor violates the TCPA, your position is that the person who hired him is always liable. No. Well, that's what non-delegable duty means. Not exactly. The Christensen case offers a very interesting fact pattern that's distinct from this one. Your Honor was on that panel, I know. And the Christensen case had significantly different facts from this case with respect to the conduct which was authorized under the contract. What happens in these types of TCPA settings is one of two things. Either the telemarketer company who's hired goes off the rails and does something that's unexpected, or they do exactly what's expected and mistakes get made, and then there are violations. The latter is a part of doing business in any industry. There are going to be errors. There were errors here. How do we know that 69% is above a critical error rate that should have created a red flag, moving to the ratification theory rather than express agency? We think this is a jury question, and Judge Gee thought it was a jury question in the Brown v. Direct TV case, a 10% question. So, again, I think a jury can weigh that and decide whether or not that's a sufficient showing of fact, and perhaps it is and perhaps it isn't. But the district court precluded a fact finder from deciding that issue, deciding whether that was sufficient for somebody to have reason to look into it further, which they undoubtedly did nothing to do. Counsel, I'd like to ask you a factual question, and it goes to the issue of apparent authority. At what point in the script, I don't know if we have a script, but at what point when the calls were being made by prospects did their representatives mention royalties? We don't have a copy of that script in the record, Your Honor. Well, what evidence do you have, whether you have the script or not? Well, what we have is we know that a decision was made during a particular call to transfer to royalties. We know that from the deposition of Jennifer Poole, and I can try and find a page citation. I think we all understand that a decision was made. Judge Wardlow was asking you when a plaintiff, a consumer, would have heard the word royalties. Let me rephrase your question. Or even the words cruise. Well, the word cruise was certainly conveyed. But when? When? At what point? By whom? By prospects DM before the call was transferred. And that was testified to by Mr. Grant. But we're trying to figure out where in point in time. Let me ask this question, since if you can answer Judge Wardlow's question, it would be really helpful. Can you tell us when somebody first heard those words? Let me defer this during my colleague on the other side's argument. Let me ask you a question I think you can answer. When did the TCPA violation occur? It occurred the moment that the prerecorded voice was played. Okay. So when somebody picks up the phone. Somebody picks up the phone, there's the robo-dialer on the other end, the violation occurs. And the statutory damages for the violation, put aside who's liable for it in this case, become due at that point. You're entitled to them simply because you picked up, the consumer picked up the phone and heard the prerecorded message without giving consent. Correct. Thank you. And it doesn't matter when in that prerecorded message or whether the words royal sees were uttered. Is that what you're saying? It doesn't matter to liability as to the ultimate penalty that's due under the statute. It does matter as to who is responsible for paying that as to what conduct occurs after that happens. And that's what our argument is based on. The conduct that happened after the person picked up the phone, that's what gives rise to liability from royal sees. In addition, the contract itself gives rise to liability because the contract establishes an agency relationship. Because there is ample evidence of an authority to control by royal sees, including the absolute right to terminate at will for any reason. Which is historically considered the most important aspect of establishing agency. All right. Thank you, Counsel. Thank you, Your Honor. All right. Mr. Pelzer. Thank you, Your Honor. Good afternoon. May it please the Court. My name is Jack Pelzer here today representing Royal Sees Cruises. The central question, of course, is whether the plaintiffs adduced evidence in the record sufficient to defeat a motion for summary judgment. But before we even get to that question, we have to address the question of whether the issue of agency was properly preserved in this case. Let's assume it was. All right. It may not have been as to maybe one of the theories, but I think it was appropriately preserved, at least to some of the agency arguments. Could you start where we were trying? I was at least trying to direct your friend and address the ratification issue. Certainly, Your Honor. And tell me where I'm reading the record wrong. Your clients knew that during a period of time, I think it's approximately 16 months, but I may be wrong about this, the firm that was doing the telemarketing claims to have obtained 2.1 million consents. Correct? Those numbers, Your Honor, I don't have off the top of my head. That sounds like it. Yeah, I mean, I could be wrong on the number of months, but I'm sure I'm right on the number of consents. And the other side brought in an expert witness to say that's preposterous. Anybody who's been involved in this industry, as your client's representative was, should have known that you can't get that many consents during that time period, particularly from the limited number of websites that were reported as the sources for those consents. Why isn't that enough to get to the jury on a ratification theory? Well, Your Honor, first of all, the purported expert that the plaintiffs brought forth, the testimony was never tested or accepted by the district court. Nor was it rejected. That's correct. The district court could have said, I don't find this to be a proper Rule 56 submission because I don't believe this person's an expert. But it's here in the record, and so why doesn't it create a fact question? Well, because, Your Honor, there's no evidence in the record that there's anything about the number of transfers or consents that should have given my client any kind of a red flag. Well, isn't that what the expert says? The expert says those familiar with this industry or something like that should know this is a red flag. This is just too many consents. And then couple that with whatever the error rate is. I know the error rate gets adjusted in various arguments. Coupling that with the error rate, why shouldn't that have given your client a red flag, if you will? Well, my client is neither a computer expert nor is my client the telemarketing company. But Ms. Poole said that she was aware of compliance problems within the industry, or at least that's how her testimony is. And that's the reason why she insisted on all this compliance in order to, first of all, before we even started the program, test with the websites, make sure they were compliant. And then afterward, doing our due diligence, running the test, comparing the information that we got from the called party to the information we got from the calling party. And there's a mismatch. And there was a mismatch of a certain percentage, which is? A little bit less than 13 percent, yes. Is that large? Do we have any benchmark? There's none that's given to us by the plaintiffs, Your Honor. I heard for the first time today about the Brown case, and my colleague suggested that we should use the 10 percent figure from that. But, again, that's 10 percent of known violations versus 87 percent of known non-violations, which is the evidence that we had. The numbers don't correlate. It's comparing apples to oranges. And so there's no reason to draw a benchmark from that. There's certainly no evidence in the record, even from the plaintiffs' experts, that says that the 87 percent compliance rate, proven compliance rate, is somehow too low. And, of course, it's the plaintiff's burden on that. So I think that gets back to being the answer to Judge Hurwitz's question, is that there may have been a lot of volume of calls being made. Of course, we don't know how many of those were actually transferred to Royal Seas. They weren't all transferred to Royal Seas. Well, on that point, does your client, which apparently did approve in advance or have the right to approve in advance the scripts that Prospects was using, did your client dictate or at least know when the words Royal Seas were first mentioned in the Prospects call that were placed to non-consenting people? Presumably because of that authority, they could have imposed some kind of a requirement on that. We don't know whether it was actually done. We don't know whether the scripts were followed because we don't have the recording of Prospects' part of the call. Is there any evidence in this case that—I'm thinking of caller ID. If I get a caller ID that says Royal Cruise Lines, I might pick up the call because I'm interested in a cruise. Is there any evidence in this case that before the violation occurred, before somebody picked up the phone and began to listen to the prerecorded call, that anybody had any hint that this was coming from Royal Cruise? No, Your Honor. In fact, it would be incorrect to give them that impression because these calls were coming from Prospects not on behalf of just Royal Seas but also on behalf of— Royal Seas. So I'm trying to think of a case where somebody was induced to pick up the phone because somebody was calling on behalf of the cruise line. I'm interested in cruises, so I ought to pick up the phone and listen, even though I haven't consented to the prerecorded call. But there's no evidence in this case that that's what occurred here. There's no evidence about any caller ID involvement at all, what was put out, pushed out by Prospects when they had the calls made for them. Can you answer Judge Wardlaw's question? And which one was that, Your Honor? At what point in time did at all, if any, did the Royal Seas cruise or cruise name come up when someone was— The earliest point in time that this record would support would be at the time that the call was transferred to Royal Seas from Prospects. Prior to that, we have no evidence of any representation regarding Royal Seas at all. And again, as I said, when the person got the call, they may have been talking about diabetes supplies before they got around to going on cruises or moving on to getting storm windows. So we have no information as to the earliest mention by Prospects of Royal Seas or even of cruising? Two Prospects. The earliest mention to the caller. Right, by Prospects. We have no information that Royal Seas was identified by name to the callee. But there was an earlier point in the call where someone was asked for a prompt whether they were interested in cruises, right? Right. But without a name associated? Presumably, yes, Your Honor, but we don't know because that's just not in the record. The plaintiff hasn't made that point. Given what they were offering, these guys strike me as the people who are putting advertising on Fox News. Diabetes, walkers, cruises, storm windows. I wouldn't have either. And presumably it works because people keep doing the advertising. But let's go back to ratification for a moment. Is there a number? Putting aside the expert report for a second, which is quite detailed, is there a number of calls when your telemarketer calls you back and says, we've obtained 100 million consents? Is that a red flag? I'm not sure that, well, first of all, we don't know whether that call was made, but, again, that depends upon the intent of the person who received that information. Yeah, but here the evidence is, I think there's no dispute about this, that your client was provided with records that indicated that 2.1 million consents had been obtained over a period of about a year and a half. I haven't worked out how many a day that is, but it's a lot. Is that enough to put up a red flag? It may have been the same person over multiple times, Your Honor, because, again, remember these consents were obtained by people who would surf on websites. So the same person may have consented? Multiple times, Your Honor. By clicking that box? By clicking that box. Which had Royal Seas in a little tiny print next to the submission line. Yeah, but it would also be after filling in their name and their contact information. So, you know, that was done for a reason, and that, of course, had to have been done large enough for the person putting it in to see it. So where the checkbox was, there's been no argument by the plaintiffs in this case that any of those checkboxes were, you know. Well, it's a good thing you didn't have an arbitration clause attached to it because then you'd have another problem. But part of the record I'm not sure I understand completely. This is 2.1 million. Does your client know from which websites these consents are allegedly obtained from those records? We know some of them, but there were literally thousands and they changed. Thousands of websites? Thousands of websites, yes, and they did change over time. But we're only talking about a couple of them here. But we're only talking about two websites that are particularly involved with this class. Those are the ones that the plaintiff alleges. Right, and that's why I was asking, is there any way in this record we can tell how many consents were allegedly obtained from these two websites? My colleague may know the answer to that, Your Honor. I'm sure we'll hear that it was some outrageous number. But there's no indication that this kind of performance data was put forward to my client.  No, I'm asking what the data given to your client showed. In other words, your client says, yes, I got a report. Here's the reports we got, and it shows people who allegedly consented. I think it shows websites, but I'm not positive that it does. So my question is, could your client, looking at that, say, oh, my gosh, there's just no way this many consents could have been obtained during this time period? Again, assuming they weren't multiples, assuming that maybe multiple people on the same phone from the same family, but any number of situations like that. So I'm not sure that the total number in the $2 million range. Now, of course, if you got into billions, that might be a different story. But, again, the concern that my client had was when they did the original due diligence on this project, looking at what the website showed, making sure that there was the compliant information in the websites, and then doing the cross-checking afterwards as they went along on a regular basis and getting to this 87% plus figure. And so with those in hand, my client was comfortable that there was compliance. And, of course, red flags means more than something that a highly suspicious person might choose to investigate. It has to be something affirmative that puts us on notice. And there was no notice, none at all, to RSC that there were any violations in this program until these lawsuits were filed. Up until then, we had had no complaints, and since then had no complaints, from a single called party about a TCPA violation. And so there was absolutely nothing to put my client on notice or to impose any red flag to require my client to go further and do any further investigation. Does that require us to ignore the expert report? Well, I don't think the expert report, Your Honor, gives these numbers. The expert is, again, as I say, we have our concerns about the expert, but we're accepting them for the time being just because it's something on summary judgment. But to draw the conclusion from that, that that is a red flag to my client, and this is an argument that wasn't even made by the plaintiffs in their briefs. They never alleged that the sheer number in this expert report was this independent red flag. Instead, they relied on, frankly, some misrepresentation of the record about my client's past history as well as just the fact that it was telemarketing in general and that telemarketers are all bad and therefore should all be suspect. But, of course, this Court has held that telemarketing is just a commonplace commercial activity, goes on every day, and should not be a basis for a red flag. So that's a foreclosed argument, I believe. In fact, if you look at the transcripts of the calls that were made to these individuals, these two plaintiffs, the call to party is actually excited and happy about the prospect of a free cruise. Except the one who wasn't the wrong person. Well, he was also expressing some degree of pleasure at being offered a free cruise because it wasn't being denied to him because the name didn't match. But there was no suggestion at any point in time of a TCPA violation in any of those calls. I'm not sure that it's reasonable to expect somebody who gets a call out of the blue that says, I'm calling on behalf of X, Y, and Z to say, you know, I think you're committing a TCPA violation. They would probably not know the initials at all, Your Honor, but they would say something along the lines of They would probably say, hang up. Which ultimately Mr. Forrest did on one of these calls. But none of this rises to the level of any kind of a red flag that should have put my client on notice. And, of course, we don't even get to red flags. I realize I've just gone over my time. We don't even get to red flags unless we have a ratifiable event, which means something that was done by a person who was an agent or at least purported to be an agent of my client. And we simply don't have that in this case. And I know you're running over, but I wanted to get back to your waiver question. And here's my problem with it, so disabuse me of the notion if I'm wrong. The district court treated each of these three theories of agency. Yes, Your Honor. Actual, apparent authority and ratification. Is your argument that they haven't properly preserved it to us or that they didn't properly preserve it below? Didn't properly preserve it below, Your Honor. Well, but if the district court treated it, isn't it preserved? Well, the— Even if they didn't make it, I mean. Your Honor, if we had gone simply on the plaintiff's motion for summary judgment, that order wouldn't have— Right, but the district court thought the plaintiff raised these theories. I believe that the district court thought that these theories were raised because my client raised them. But they were there in the record and the district court addressed them, so how do we avoid them? And that was as a result, frankly, of my client having to play a game of whack-a-mole and try to figure out all the various agency theories that could possibly be simply because the word agency was included. I understand. It's a boilerplate. Thank you. Thank you, Your Honor. Thank you, counsel. Mr. Bacon, you went over your time, but I'll give you two minutes. Thank you. I'll go very quickly. Great. So as to Your Honor's question with respect to language that was given to consumers prior to the transfer, I would point to Jennifer Poole's deposition transcript that's in the record, at excerpts of record 973 to 975, where she says that Prospects DM was supposed to only transfer people if they expressed an interest in Royal Seas Cruise's products. And she also testified numerously that Prospects' scripts were approved by Royal Seas Cruises. So there is information in the record to suggest that consumers were informed about these services before the transfer. They were informed about the product, which is a cruise. Is there any evidence in the record that at least prior to the transfer, anybody heard the word Royal Seas? So that testimony that I just referenced suggests that that was the case. We can all read the testimony. It says they were told about the products, the products being a cruise. If I tell you about a car, I'm not telling you about General Motors. The question is, was Royal Seas mentioned? Ms. Poole explicitly says Royal Seas Cruises was mentioned. No, at the transfer. She doesn't say Royal Seas. I'm reading the testimony. Read it again. Tell me what she said. Let me find the exact line. I'll read it to you. Give me one second, Ronnie. They were informed about Royal Seas products. Yes, that's part of what it says. Page 94. 975. Right. They're going to make an outbound call to a consumer that has a valid opt-in. And if the consumer is interested in the Royal Seas Cruise, they will transfer the consumer to us for more details. Right, but we don't know that that told them about a Royal Seas Cruise. All we know is that it told them about a cruise. And that seems to be what the prerecorded calls say, right? Because you're asked about interest in a whole bunch of stuff. There's not enough information for me to answer that question. Thank you. Now, real briefly as to the issue that counsel just mentioned, I know I'm going over, I'll be very quick. On pages 397 to 400, DeForest's transcript of his call shows four instances where he said he was called out of the blue. And they didn't do anything to investigate. I think that is a triggering event that should raise a red flag because they've got a consent record that says that he went on a website. And they're engaging with him during this call and telling him, yeah, we called you out of the blue. You're lucky. You get this cruise. And they don't look into any of this. These websites. So are you saying that that website except clicked form is invalid? Well, it is invalid. We proved it was invalid because you can't actually opt into that website. And on that same note, Ms. Poole testified in multiple instances that one of her roles was to look at the website opt-in language and review it with counsel for Royal Seas. And if they had done that with the website that DeForest's information came from, they would have found that Royal Seas' information wasn't in the opt-in language. And so they abdicated that responsibility that they unquestionably had. And had they not done so, people whose information came from that website and that lead vendor would never have been called, including Mr. DeForest. So that's another issue that we have with ratification is that they had expressed duty to do that under the contract and under Ms. Poole's own description of what she herself did and what their counsel did. And they didn't do it. And then an error was made as a result. So there are ratification problems up and down the gamut. But I'm well over my time. Unless you have questions for me, I don't want to go over too much more. Thank you, counsel. McCurley v. Royal Seas Cruises is submitted.
judges: WARDLAW, HURWITZ, Rosenthal